**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| OLYMBEC USA LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CLOSED LOOP REFINING AND RECOVERY, | ) |
| INC.; CLOSED LOOP GLASS SOLUTIONS, | ) |
| LLC; FEDERAL PRISON INDUSTRIES, INC. | ) Case No. |
| D/B/A UNICOR; KUUSAKOSKI INC.; | ) |
| KUUSAKOSKI US LLC; KUUSAKOSKI | ) |
| GLASS RECYCLING LLC; VINTAGE TECH, | ) |
| LLC A/K/A VINTAGE TECH RECYCLERS, | ) |
| INC. and VINTAGE TECH RECYCLING; | ) |
| ACCURATE IT SERVICES LTD.; B&K | ) |
| TECHNOLOGY SOLUTIONS INC. D/B/A | ) |
| ADVANCED TECHNOLOGY RECYCLING; | ) |
| AIM ECYCLING, LLC; AMERICAN GREENZ | ) |
| INC; AMERICAN RETROWORKS, INC.; | ) |
| ARROW RECOVERY GROUP, INC; CIE | ) |
| INTERNATIONAL L.L.C. D/B/A C2 | ) |
| MANAGEMENT; COHEN ELECTRONICS, | ) |
| INC.; COMPLETE RECYCLING SOLUTIONS, | ) |
| LLC; COMPRENEW; COMPUPOINT USA | ) |
| LLC; COMPUTER RECYCLING OF | ) |
| VIRGINIA, INC.; DYNAMIC LIFESTYLES | ) |
| INNOVATIONS INC. A/K/A DYNAMIC | ) |
| RECYCLING, INC. A/K/A DYNAMIC 1 TO 1 | ) |
| CONTRACT LOADS; ECYCLESECURE, LLC; | ) |
| E-LOT ELECTRONICS RECYCLING, INC.; | ) |
| ENVIRONMENTAL COORDINATION | ) |
| SERVICES AND RECYCLING, INC.; | ) |
| EREVIVAL LLC; ROBERT A. ERIE; EWASTE | ) |
| RECYCLING SOLUTIONS, LLC; EWORKS | ) |
| ELECTRONICS SERVICES, INC.; E-WORLD | ) |
| RECYCLERS, LLC A/K/A E-WORLD ONLINE, | ) |
| LLC; GEEP HOLDINGS INC.; GEEP USA INC.; | ) |
| GREAT LAKES ELECTRONICS | ) |
| CORPORATION; GREEN CHIP, INC.; GREEN | ) |
| TECH RECYCLING LLC; GREEN WAVE | ) |
| COMPUTER RECYCLING, LLC; INTERCO | ) |
| TRADING COMPANY; IMS ELECTRONICS | ) |
| RECYCLING, INC.; JD BEAVERS CO. LLC; | ) |
| MRC I, LLC D/B/A MRC RECYCLING; ABC | ) |
| CORP HOLDINGS LLC D/B/A OHIO DROP | ) |

OFF, LLC; POTOMAC ECYCLE, LLC; F&F )
ENVIRONMENTAL, INC. D/B/A )
QUICKSILVER RECYCLING SERVICES; )
RMG ENTERPRISE, LLC; ROCHESTER )
COMPUTER RECYCLING & RECOVERY, )
LLC; SIAM RECLAIM TECHNOLOGIES, INC.; )
STRICKLAND ELECTRONIC RECYCLING, )
LLC; SUNNKING, INC.; TK6, INC.; USB )
RECYCLING.COM, LLC; WASTE )
COMMISSION OF SCOTT COUNTY; and )
FORMALLY BARDWILLS, LLC D/B/A WE )
ELECTRONICS. )
                                     )
                Defendants.          )
                                     )

## **COMPLAINT**

Plaintiff Olymbec USA LLC ("Olymbec" or "Plaintiff"), by the undersigned

counsel, as and for its Complaint alleges as follows against Closed Loop Refining and

Recovery, Inc. and Closed Loop Glass Solutions, LLC (hereinafter referred to collectively

as "Closed Loop" or the "Defendant Closed Loop") and the "Arranger/Transporter

Defendants," which include, respectively and together, Federal Prison Industries, Inc. d/b/a

UNICOR ("UNICOR"); Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Glass

Recycling LLC ("Kuusakoski Recycling"), and Vintage Tech, LLC a/k/a Vintage Tech

Recyclers, Inc. and Vintage Tech Recycling ("Vintage Tech") (with Defendants

Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech,

respectively and together, the "Kuusakoski Defendants"); Accurate IT Services LTD.

("Accurate IT"); B&K Technology Solutions Inc. d/b/a Advanced Technology Recycling

("ATR"); AIM Ecycling, LLC ("AIM"); American Greenz Inc. ("American Greenz");

American Retroworks, Inc. ("ARI"); Arrow Recovery Group, Inc. ("ARG"); CIE

International L.L.C. d/b/a C2 Management ("C2"); Cohen Electronics, Inc. ("Cohen");

2

Complete Recycling Solutions, LLC ("CRS"); CompuPoint USA LLC ("CompuPoint"); Computer Recycling of Virginia, Inc. ("CRV"); Dynamic Lifestyle Innovations Inc., a/k/a Dynamic Recycling, Inc. a/k/a Dynamic 1 to 1 Contract Loads ("Dynamic"); eCycleSecure, LLC ("eCycle"); E-Lot Electronics Recycling, Inc. ("E-Lot"); Environmental Coordination Services and Recycling, Inc. ("ECSR"); eRevival LLC ("eRevival"); Robert A. Erie, individually; eWaste Recycling Solutions, LLC ("eWaste Recycling"); eWorks Electronics Services, Inc. ("eWorks"); E-World Recyclers, LLC a/k/a E-World Online, LLC ("E-World Online"); GEEP Holdings Inc. GEEP; GEEP USA Inc. ("GEEP USA"); Great Lakes Electronics Corporation ("Great Lakes"); Green Chip, Inc. ("Green Chip"); Green Tech Recycling LLC ("Green Tech"); Green Wave Computer Recycling, LLC ("Green Wave"); Interco Trading Company ("Interco"); IMS Electronics Recycling, Inc. ("IMS"); JD Beavers Co., LLC ("JB Beavers"); MRC I, LLC d/b/a MRC Recycling ("MRC"); ABC Corp Holdings LLC d/b/a Ohio Drop Off, LLC ("Ohio Drop Off"); Potomac eCycle, LLC ("Potomac"); F&F Environmental, Inc. d/b/a Quicksilver Recycling Services ("Quicksilver"); RMG Enterprise, LLC ("RMG"); Rochester Computer Recycling & Recovery, LLC ("RCRR"); Siam Reclaim Technologies, Inc. ("Siam"); Strickland Electronic Recycling, LLC ("Strickland"); Sunnking, Inc. ("Sunnking"); TK6, Inc. ("TK6"); USB Recycling.com, LLC ("USB"); Waste Commission of Scott County ("Waste Commission"); and Formally Bardwills, LLC d/b/a We Electronics ("We").

## **NATURE OF THE ACTION**

1.     This action seeks declaratory relief, cost recovery and damages recoverable under the common law and in equity resulting from environmental contamination

proximately caused by Defendant Closed Loop and the Arranger/Transporter Defendants at a portion of a warehouse property owned by Olymbec and located at 2200 Fairwood Avenue, Columbus, Ohio 43207 (hereinafter referred to as the "Property"). Plaintiff's claims for relief arise under (i) the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675; and (iii) principles of common law and in equity.

2.      As more fully demonstrated below, Defendant Closed Loop and the Arranger/Transporter Defendants collaborated in or allowed the stockpiling and abandonment of electronic waste ("e-waste"), primarily consisting of cathode ray tubes and cathode ray tube glass in Ohio (including the Property) and to profit thereby. More than 30 million pounds of hazardous electronic waste has been stockpiled and abandoned at the Property. The Defendants collected millions of dollars in revenue over a four (4) year period. This has left Olymbec with the costs of removing and/or remediating hazardous e-waste and other environmental conditions at the Property at a cost that will exceed $4.0 million.

3.      In late 2014 Defendant Closed Loop leased the Property from Olymbec, claiming to be a bona fide recycler of cathode ray tubes (or "CRTs"), which are the glass vacuum tubes that constitute the video display component of televisions, computer monitors, and other electronic devices. Defendant Closed Loop charged artificially low prices to undercut the national e-waste recycling market and to accept as many CRT-containing electronic devices ("CRTs") as possible, including CRTs from the Arranger/Transporter Defendants, to maximize short-term profits. Defendant Closed Loop

cross-contaminated a significant portion of the remaining CRT glass by crushing both the leaded funnel glass and the front, panel glass at one or more other facilities it operated in Ohio, and transported some of that crushed glass to the Property, creating a worthless stream of commingled leaded and nonleaded glass. This ostensibly "processed" CRT glass has remained stockpiled at the Property and at other Closed Loop facilities in Ohio, without any feasible means to recycle it.

4.     The Arranger/Transporter Defendants aided and abetted the scheme by transporting and/or arranging for the transport of CRTs and other e-waste to the Property and to other Closed Loop facilities in Ohio, despite the fact that they knew or should have known that Defendant Closed Loop was a sham recycler and had no legitimate or feasible means to recycle CRTs and other e-waste. The Arranger/Transporter Defendants had the sophistication and the experience in the e-waste industry to ascertain the true nature of Defendant Closed Loop's sham recycling operation, yet continued to cause truckload after truckload of CRTs and other e-waste to be deposited at the Property and at other Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices. The Arranger/Transporter Defendants each fully recognized or should have recognized at the time the arrangements were made and/or at the time the CRTs and other e-waste were accepted for transport that Defendant Closed Loop had no objectively legitimate and feasible means to recycle CRTs and that CRTs and other e-waste would not be recycled. They thus provided material support to the sham recycling scheme and should likewise be held accountable for the environmental contamination and other damages that have resulted.

5.      In early 2016, Defendant Closed Loop abandoned the Property, leaving behind stockpiles of whole CRTs and "processed" CRT glass that had been packed into the Property sometimes 15-20 feet high.  Significant portions of the Property remains inaccessible given the manner in which Defendant Closed Loop blocked aisles to make room for more inbound shipments from the Arranger/Transporter Defendants.

6.      Olymbec now brings this action to require Defendant Closed Loop and the Arranger/Transporter Defendants to clean up and/or pay for the cleanup of more than 30 million pounds of CRTs, CRT glass, and other e-waste that currently remains at the Property.

**PARTIES**

A.      **Plaintiff Olymbec**

7.      Plaintiff is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its principal office and place of business in the United States located in Memphis, Tennessee.  Olymbec acquired the Property in December of 2013 by a limited warranty deed.

B.      **Defendant Closed Loop**

8.      Closed Loop Refining and Recovery, Inc. is a corporation organized under the laws of the state of Arizona, with a principal office and place of business in Phoenix, Arizona.  Starting in late 2014 and extending into 2016, Defendant Closed Loop was a tenant occupying the Property and conducted operations at the Property.

9.      Closed Loop Glass Solutions, LLC is a limited liability company organized under the laws of the state of Arizona, with a principal place of business in Scottsdale, Arizona.  In December of 2014, Closed Loop Glass Solutions, LLC was registered in the

State of Ohio as a foreign, for profit limited liability company. At all times relevant to this action, Closed Loop Glass Solutions, LLC was controlled by the same individuals that controlled Closed Loop Refining and Recovery, Inc. Upon information and belief, Defendant Closed Loop Glass Solutions, LLC, sometime in late 2014, commenced operations at the Property. Such operations included a CRT glass "washing" process that required the use of hydrofluoric acid. Such "washing" process was part of a futile effort of the Defendant Closed Loop to prepare shipments of CRT glass to one or more businesses that would further process such glass for the manufacturing of useful products.

10. At all times relevant to this action, Defendant Closed Loop operated out of at least three (3) properties or facilities located in Columbus, Ohio. The facilities are located at 1655 Watkins Road, 1675 Watkins Road and 2200 Fairwood Avenue. The first two (2) facilities were, at all times relevant to this action, and continue to be owned by Garrison Southfield Park, LLC ("Garrison"). The third, as already stated, is owned by Olymbec.

11. Most of the shipments of CRTs and other e-waste that were transported by the Arranger/Transporter Defendants to Closed Loop facilities in Ohio were shipped to one of the two facilities owned by Garrison. In some instances shipments were sent directly to the Property. In at least one other instance, a shipment was diverted from one of the facilities on Watkins Road to the Property.

12. At the Closed Loop facilities on Watkins Road, Defendant Closed Loop would crush whole CRT tubes resulting in the mix of leaded glass and "clean" glass. The mix of leaded glass and clean glass would then be stored in gaylords or other boxes or containers. There were occasions when gaylords or other containers of the "mixed" glass

7

were transferred from the Closed Loop facilities on Watkins Road to the Property. The result is that CRTs records evidencing the transportation of CRTs and other e-waste to the Closed Loop facilities in Ohio do not reflect the Closed Loop facility that eventually contained the CRTs, CRT glass and other e-waste.

### C. Defendant UNICOR

13.     Defendant UNICOR is a wholly-owned government corporation pursuant to 31 U.S.C. §9101(3)(E), with a principal place of business in Washington, DC. Pursuant to 42 U.S.C. §9620(a)(1), the federal government waived sovereign immunity for purposes of cases arising under 42 U.S.C. §9607. Starting in 2012 and extending into 2015, Defendant UNICOR arranged for the transport of over 4.6 million pounds of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

### D. The Kuusakoski Defendants

14.     Defendant Kuusakoski Inc. is a corporation organized under the laws of the state of Delaware, with a principal place of business in Philadelphia, Pennsylvania. Defendant Kuusakoski Inc. holds itself out as operating as a parent of Defendants Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech. Kuusakoski Inc.'s 2015 financial statements, however, provide that "[t]he operations of Vintage Tech, which was acquired at the end of 2014 by Defendants Kuusakoski Inc., Kuusakoski US LLC, Kuusakoski Recycling, and/or one of their related entities in 2014., were *integrated* with those of Kuusakoski" (emphasis added); thus, the Defendant Vintage Tech acquisition appears to have been more of a consolidation or merger, and Kuusakoski Inc. appears to have otherwise managed, directed, or conducted the operations of Defendant Vintage Tech. Starting in 2012 and extending into 2016, Defendant Kuusakoski Inc. and/or one or

8

more of its related entities, Defendants Kuusakoski US LLC, Kuusakoski Recycling, and Vintage Tech, arranged for the transport of millions of pounds of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

15.     Defendant Kuusakoski US LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Plainfield, Illinois. Defendant Kuusakoski US LLC holds itself out as operating as a subsidiary of Kuusakoski Inc.  Starting in 2012 and extending into 2016, Defendant Kuusakoski US LLC and/or one or more of its related entities, Defendants Kuusakoski Inc., Kuusakoski Recycling, and Vintage Tech, arranged for the transport of millions of pounds of CRTs and other e-waste to the Closed Loop facilities in Ohio, including the Property, in part, through an entity known as "VTKK LLC." VTKK LLC had previously operated as a joint venture between Defendant Kuusakoski US LLC and Defendant Vintage Tech and/or one or more related entities before it was merged into Defendant Kuusakoski US LLC in 2015. Defendants Kuusakoski US LLC, Kuusakoski Inc., Kuusakoski Recycling, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

16.     Defendant Kuusakoski Recycling is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Defendant Kuusakoski Recycling holds itself out as operating as a subsidiary of Defendant Kuusakoski Inc. Starting in 2012 and extending into 2016, Defendant Kuusakoski Recycling and/or one or more of its related entities, Defendants Kuusakoski Inc., Kuusakoski US LLC, and Vintage Tech, arranged for the transport of millions of pounds of CRTs and other e-waste to Closed Loop facilities in Ohio, including the

Property. Defendants Kuusakoski Recycling, Kuusakoski Inc., Kuusakoski US LLC, and/or one of their related entities acquired Defendant Vintage Tech in 2014.

17.     Defendant Vintage Tech is a limited liability company organized under the laws of the state of Illinois, with a principal place of business in Plainfield, Illinois. Vintage Tech holds itself out as operating as a subsidiary of Kuusakoski Inc. Records generated by the Kuusakoski Defendants refer to Vintage Tech, LLC, Vintage Tech Recyclers, Inc. and Vintage Tech Recycling interchangeably, including shipping documentation and Kuusakoski Inc.'s 2014 financial statements.  Starting in 2012 and extending into 2016, Defendant Vintage Tech arranged for the transport of millions of pounds of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

     **E.     Other Arranger/Transporter Defendants**

18.     Defendant Accurate IT is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio.  Starting in or around December 2012 and extending into or around September 2014, Defendant Accurate IT arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

19.     Defendant ATR is a corporation organized under the laws of the state of Illinois, with a principal place of business in Pontiac, Illinois.  Starting in or around June 2015 and extending into or around February 2016, Defendant ATR arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

20.     Defendant AIM is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Toledo, Ohio.  Starting in or around

June 2013 and extending into or around November 2014, Defendant AIM arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

21.     Defendant American Greenz is a corporation organized under the laws of the state of North Carolina, with a principal place of business in Morrisville, North Carolina.  Starting in or around March 2014 and extending into or around December 2015, Defendant American Greenz arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

22.     Defendant ARI is a corporation organized under the laws of the state of Delaware, with a principal place of business in Middlebury, Vermont.  Starting in or around May 2012 and extending into or around January 2014, Defendant ARI arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

23.     Defendant ARG is a corporation organized under the laws of the state of California, with a principal place of business in Fremont, California.  Starting in or around April 2012 and extending into or around November 2012, Defendant ARG arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

24.     Defendant C2 is a limited liability company organized under the laws of the state of Virginia, with a principal place of business in Berryville, Virginia. Starting in or around May 2014 and extending into or around February 2016, Defendant C2 arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

25.     Defendant Cohen is a corporation organized under the laws of the state of Ohio, with a principal place of business in Middletown, Ohio.  Starting in or around August 2013 and extending into or around June 2015, Defendant Cohen arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

26. Defendant CRS is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Fall River, Massachusetts. Starting in or around April 2015 and extending into or around December 2015, Defendant CRS arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

27. Defendant Comprenew is a nonprofit corporation organized under the laws of the state of Michigan, with a principal place of business in Grand Rapids, Michigan. Starting in or around July 2015 and extending into or around February 2016, Defendant Comprenew arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

28. Defendant CompuPoint is a limited liability company organized under the laws of the state of Georgia, with a principal place of business in Norcross, Georgia. Starting in or around October 2012 and extending into or around January 2016, Defendant CompuPoint arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

29. Defendant CRV is corporation organized under the laws of the state of Virginia, with a principal place of business in Tappahannock, Virginia. Starting in or around July 2015 and extending into or around February 2016, Defendant CRV arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

30. Defendant Dynamic is a limited liability company organized under the laws of the state of Wisconsin, with a principal place of business in Onalaska, Wisconsin. Starting in or around January 2013 and extending into or around March 2016, Defendant

Dynamic arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

31.     Defendant eCycle is a limited liability company organized under the laws of the state of North Carolina, with a principal place of business in Charlotte, North Carolina. Starting in or around June 2012 and extending into or around September 2015, Defendant eCycle arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

32.     Defendant eLot is a corporation organized under the laws of the state of New York, with a principal place of business in Glenmont, New York. In or around April 2015, Defendant eLot arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

33.     Defendant ECSR is a corporation organized under the laws of the state of Pennsylvania, with a principal place of business in Cochranton, Pennsylvania.  Starting in or around June 2012 and extending into or around July 2014, Defendant ECSR arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

34.     Defendant eRevival is a limited liability company organized under the laws of the state of New Jersey, with a principal place of business in Garfield, New Jersey. Starting in or around July 2014 and extending into or around October 2015, Defendant eRevival arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

35.     Defendant Robert A. Erie is an individual who, upon information and belief, resides in a federal correctional system re-entry center in San Diego, California. Defendant Erie served at all times relevant to the allegations herein as the Chief Executive

13

Officer of Defendant E-World, which arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, starting in or around June 2012 and extending into or around November 2014.

36.     Defendant eWaste Recycling is a limited liability company organized under the laws of the state of Maine, with a principal place of business in Auburn, Maine. Starting in or around August 2012 and extending into or around March 2013, Defendant eWaste Recycling arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

37.     Defendant eWorks is a corporation organized under the laws of the state of New York, with a principal place of business in Freeport, New York.  Starting in or around January 2016 and extending into or around February 2016, Defendant eWorks arranged for the transport of CRTs or other e-waste to Closed Loop facilities in Ohio.

38.     Defendant E-World is or was a limited liability company, with a principal place of business in Vista, California.  Starting in or around June 2012 and extending into or around November 2014, Defendant E-World arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

39.     Defendant GEEP is a corporation organized under the laws of Canada, with a principal place of business in Barre, Ontario.  Starting in or around September 2012 and extending into or around June 2013, Defendant GEEP arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

40.     Defendant GEEP USA is a corporation organized under the laws of the state of North Carolina, with a principal place of business in Durham, North Carolina.  Starting in or around September 2012 and extending into or around May 2015, Defendant GEEP

14

USA arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

41.     Defendant Great Lakes is a corporation organized under the laws of the state of Michigan, with a principal place of business in Warren, Michigan.  Starting in or around September 2015 and extending into or around February 2016, Defendant Great Lakes arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

42.     Defendant Green Chip is a corporation organized under the laws of the state of New York, with a principal place of business in Brooklyn, New York.  Starting in or around August 2013 and extending into or around April 2014, Defendant Green Chip arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

43.     Defendant Green Tech is a limited liability company organized under the laws of the state of Minnesota, with a principal place of business in Mankato, Minnesota. Starting in or around June 2015 and extending into or around September 2015, Defendant Green Tech arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

44.     Defendant Green Wave is a limited liability company organized under the laws of the state of Indiana, with a principal place of business in Indianapolis, Indiana. Starting in or around May 2015 and extending into or around December 2015, Defendant Green Wave arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

45.     Defendant IMS is a corporation organized under the laws of the state of California, with a principal place of business in Poway, California.  Starting in or around

February 2014 and extending into or around February 2016, Defendant IMS arranged for the transport of CRTs and other e-waste to facilities in Ohio

46.     Defendant Interco is a corporation organized under the laws of the state of Missouri, with a principal place of business in Madison, Illinois.  Starting in or around October 2015 and extending into or around January 2016, Defendant Interco arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

47.     Defendant JD Beavers is a limited liability company organized under the laws of the state of Michigan, with a principal place of business in Brighton, Michigan. Starting in or around November 2013 and extending into or around February 2015, Defendant JD Beavers arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

48.     Defendant MRC is a limited liability company organized under the laws of the state of Missouri, with a principal place of business in Imperial, Missouri.  Starting in or around October 2015 and extending into or around February 2016, Defendant MRC arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

49.     Defendant Ohio Drop Off is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio.  Starting in or around July 2015 and extending into or around March 2016, Defendant Drop Off arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

50.     Defendant Potomac is a limited liability company organized under the laws of the state of Virginia, with a principal place of business in Sterling, Virginia.  Starting in or around June 2015 and extending into or around October 2015, Defendant Potomac arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

51.     Defendant Quicksilver is a corporation organized under the laws of the state of Florida, with a principal place of business in Tampa, Florida. Starting in or around January 2013 and extending into or around May 2015, Defendant Quicksilver arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

52.     Defendant RMG is a limited liability company organized under the laws of the state of New Hampshire, with a principal place of business in Derry, New Hampshire. Starting in or around November 2012 and extending into or around February 2014, Defendant RMG arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

53.     Defendant RCRR is a limited liability company organized under the laws of the state of New York, with a principal place of business in Victor, New York.  Starting in or around June 2012 and extending into or around March 2016, Defendant RCRR arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

54.     Defendant Siam is a corporation organized under the laws of the state of Ohio, with a principal place of business in Columbus, Ohio.  In or around February 2013, Defendant Siam arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

55.     Defendant Strickland is a limited liability company organized under the laws of the state of South Carolina, with a principal place of business in North, South Carolina.  Starting in or around October 2014 and extending into or around February 2016, Defendant Strickland arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

56. Defendant Sunnking is a corporation organized under the laws of the state of New York, with a principal place of business in Brockport, New York. Starting in or around October 2014 and extending into or around December 2014, Defendant Sunnking arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

57. Defendant TK6 is a corporation organized under the laws of the state of Florida, with a principal place of business in Tampa, Florida. Starting in or around April 2015 and extending into or around February 2016, Defendant TK6 arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

58. Defendant USB is a limited liability company organized under the laws of the state of North Carolina with a principal place of business in Monroe, North Carolina. Starting in or around June 2015 and extending into or around February 2016, Defendant USB arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

59. Defendant Waste Commission is an inter-governmental agency with a principal place of business in Davenport, Iowa. Starting in or around September 2014 and extending into or around February 2016, Defendant Waste Commission arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

60. Defendant We is a limited liability company organized under the laws of the state of Ohio, with a principal place of business in Bellaire, Ohio. Starting in or around May 2015 and extending into or around August 2015, Defendant We arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

## JURISDICTION AND VENUE

61.     This Court has original jurisdiction over this civil action pursuant to 42 U.S.C. §9613(b) and 28 U.S.C. §2201.

62.     This Court has supplemental jurisdiction over Olymbec's state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to Olymbec's federal claims that they form part of the same case or controversy.

63.     Venue is proper under 42 U.S.C. §9613(b) and 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within this District, because the damages and the release and/or threatened release of hazardous substances occurred in this District, and because the Property that is the subject of this action is located in this District.

## STATEMENT OF FACTS

**A.      The Property:  Ownership and Operational History**

64.     In December of 2013, Olymbec acquired the Property by a limited warranty deed that was recorded with the Franklin County Recorder in January of 2014.

65.     In December of 2014, Olymbec entered into a lease agreement (hereinafter referred to as the "Lease") with Defendant Closed Loop, as Tenant, to lease roughly 50% of the warehouse facility located at 2200 Fairwood Avenue, Columbus, Ohio 43207 (the "Property").  The lease term commenced on January 1, 2015.

66.     Closed Loop agreed to specific duties and obligations, to wit:

a.      The Lease identified the business to be conducted within the Property as a "general office, warehouse, manufacturing for asset management, and

distribution for a cathode ray tube recycling company and for no other purpose…."

b. Olymbec tendered possession of the Property to Defendant Closed Loop in broom-clean condition.

c. The Lease required Defendant Closed Loop:

(i) to make monthly base rent payments:

(ii) to comply with federal and state hazardous waste laws;

(iii) to commit no waste upon nor do any damages to the Property;

(iv) to not cause or permit to occur, nor permit to exist, any condition which may cause a discharge of any hazardous wastes or hazardous substances on, or about, or in the Property;

(v) to refrain from any operations which could lead to liability under environmental laws on the part of Defendant Closed Loop or Olymbec;

(vi) to deliver the leased premises to Olymbec, upon termination or expiration of the Lease, in good order and condition and to remediate all damages (including damages caused by the release of hazardous wastes or hazardous substances); and

(vii) to indemnify and hold harmless Olymbec against any claims, damages or costs incurred by Olymbec under or on account of or for any discharge of hazardous wastes or hazardous substances.

67. In January of 2016, after Closed Loop failed to pay rent as required by the Lease, Olymbec sent notice to Closed Loop that Closed Loop was in default as a result of failing to timely pay rent in accordance with the Lease.

68. Defendant Closed Loop vacated the Property in late March or early April 2016, and abandoned more than 30 million pounds of CRTs, CRT glass and other e-waste at the Property.

69. CRTs contain lead, a toxic substance that can cause delayed neurological development in children and other adverse health effects in adults.

70. Used, broken CRTs and "processed" CRT glass containing lead at concentrations equal to or greater than 5.0 mg/L using the Toxicity Characteristic Leaching Procedure ("TCLP"), if not managed under the CRT conditional regulatory exclusion, are regulated as a hazardous waste under the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq.) ("RCRA") and as a hazardous substance under CERCLA.

71. Used, intact CRTs containing lead at concentrations equal to or greater than 5.0 mg/L utilizing the TCLP analysis and that are accumulated speculatively are regulated as a hazardous waste under RCRA and as a hazardous substance under CERCLA.

72. Lead is separately listed as a hazardous substance in 40 C.F.R. §302.4 and therefore constitutes a hazardous substance pursuant to 42 U.S.C. §9601(14)(B).

73. The U.S. Environmental Protection Agency ("U.S. EPA") has observed that "according to recent studies performed at the University of Florida, most color CRTs leach lead in the TCLP test at concentrations above the TC regulatory level of 5 milligrams per liter." *Hazardous Waste Management System; Modification of the Hazardous Waste Program; Cathode Ray Tubes; Final Rule*, 71 Fed. Reg. 42,928, 42,930 (July 28, 2006).

74.     Total lead content from samples collected from the Property indicate that many of the samples would likely exceed the 5.0 mg/L regulatory limits utilizing the TCLP analysis.

75.     Thus, the CRTs and other lead-impacted e-waste at the Property are both RCRA hazardous wastes and CERCLA hazardous substances.

76.     Olymbec currently estimates the costs of environmental cleanup for the Property at more than $4.0 million, although cleanup costs may vary significantly based on, among other things, the quantity of material, the availability of previously-identified disposal/recycling outlets, fuel costs, the extent of Ohio EPA's oversight over removal and/or remedial actions at the Property, and other contingencies.

77.     Section 107(a) of CERCLA, 42 U.S.C. §9607(a), imposes strict and joint and several retroactive liability on:

a.      "the owner and operator of a vessel or a facility";

b.      "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of";

c.      "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and";

d.      "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

78.     The U.S. EPA has taken the position that if the "indoor CRT glass pile becomes abandoned (for example, the recycler goes out of business), or if the CRT glass is

22

released, or poses a threat of release, from the building, businesses or facility owners/operators may become liable for the removal and proper management of the glass under RCRA, Superfund [CERCLA], or state clean-up authorities." *See* https://www.epa.gov/hw/frequent-questions-about-regulation-used-cathode-ray-tubes-crts -and-crt-glass.

79. The Ohio EPA has taken the position that: "In addition to being familiar with the manner in which electronics will be recycled, it is important to research the recycling facility to determine if it has any compliance problems. . . . If electronic equipment is not recycled properly, and it is a hazardous waste, both your company and the recycling facility will be liable for clean-up costs associated with improper disposal of hazardous components." *See* http://epa.ohio.gov/portals/32/pdf/Electronic_Equipment_Guidance.pdf.

80. Hazardous leaded CRT glass and dust has been released and continues to pose a threat of release at the Property.

81. Defendant Closed Loop operated at the Property at the time of the disposal of hazardous substances; therefore, it is strictly, jointly and severally liable for environmental cleanup costs under CERCLA as the harm caused to Olymbec is indivisible and is incapable of apportionment.

82. The Arranger/Transporter Defendants transported and/or arranged for the transport of hazardous substances to the Property; therefore, they are strictly, jointly and severally liable for environmental cleanup costs under CERCLA.

83. Given the manner in which Defendant Closed Loop processed, disassembled, broke down, labeled, stockpiled, cross-contaminated, and/or otherwise

23

managed CRTs and other e-waste, the harm caused by Defendant Closed Loop and Arranger/Transporter Defendants at the Property is indivisible and not capable of apportionment.

84.     RCRA established a cradle-to-grave program that regulates the generation, transportation, and disposal of hazardous wastes and provides for a conditional exclusion for legitimate CRT recycling operations – but only if certain criteria are met.

85.     Defendant Closed Loop withheld information or otherwise misled Olymbec as to the status of its compliance with all applicable laws, rules and regulations related to its operations and its capability to comply with all applicable laws, rules and regulations related to its operations.  In addition, it appears Defendant Closed Loop withheld information or otherwise mislead the Ohio EPA with respect to whether Defendant Closed Loop qualified for the CRT conditional exclusion from RCRA hazardous waste regulation, which applies only to legitimate CRT recycling operations, thereby generating millions of dollars in illegal revenue and imposing upon Olymbec potential liability for millions of dollars in environmental cleanup costs and other damages.

86.     The Arranger/Transporter Defendants transported and/or arranged for the transport of millions of pounds of CRTs and other e-waste to the Property, despite the fact that they knew or should have known that Defendant Closed Loop was operating a sham recycling operation and did not qualify for the CRT conditional exclusion from RCRA hazardous waste regulation, thereby generating millions of dollars in illegal revenue and imposing upon Olymbec potential liability for millions of dollars in environmental cleanup costs and other damages.

87. The Arranger/Transporter Defendants did not have an objectively reasonable basis to believe at the time of each transaction with or involving Defendant Closed Loop that the CRTs and other e-waste would be recycled. Furthermore, the Arranger/Transporter Defendants each failed to exercise reasonable care to determine whether or not Defendant Closed Loop was handling, processing, reclaiming other otherwise managing CRTs, CRT glass and other e-waste in compliance with the substantive provisions of federal, state and local laws, rules, regulations, orders or decrees.

### 1. Defendant Closed Loop

88. Defendant Closed Loop secured the Lease from Olymbec, based on false representations that Defendant Closed Loop would actually pay the rent; would be providing legitimate e-waste recycling services; and would otherwise be operating in compliance with federal and state hazardous waste laws.

89. Defendant Closed Loop entered the Ohio e-waste recycling market in 2012, with an offer to accept inbound CRTs at prices as low as $0.0700 per pound, which undercut the then-prevailing U.S. market rates of $0.11-0.12 per pound.

90. Defendant Closed Loop implemented a series of delay tactics and undertook other actions designed to mislead the Ohio EPA into believing that recycling operations at Closed Loop facilities in Ohio, including the Property, were lawful and that there was a feasible means of recycling the CRTs and other e-waste that had been accumulating at Closed Loop facilities in Ohio, including the Property.

91. These delay tactics and other actions enabled Defendant Closed Loop to continue to collect revenue for inbound CRTs and other e-waste, without ever having to incur the costs of actually recycling them.

92. Defendant Closed Loop speculatively accumulated millions of pounds of CRTs and other e-waste, generating revenue for recycling services that were never performed.

93. In late March or early April 2016, when, Defendant Closed Loop abandoned the Property and left Olymbec as the landlord, to incur more than $4.0 million in environmental cleanup costs and other damages.

### a.     75% Recycling Requirement

94. The qualifying criteria for the CRT conditional exclusion include, *inter alia*, a prohibition on "speculative accumulation," which is comprised of two components. 40 C.F.R. §261.39(a)(4) & (c).

95. The first component of the CRT conditional exclusion requires a demonstration that: "during the calendar year, commencing January first, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five per cent by weight or volume of the amount of that material accumulated at the beginning of the calendar year."

96. Defendant Closed Loop failed to qualify for the CRT conditional exclusion. Only a relatively small amount of CRT glass was processed and shipped in 2015 to Camacho, a firm based in Spain that, at the time, processed both leaded and unleaded glass from CRTs for use in the manufacturing of ceramic tiles.

97. It appears that there are nearly 20,000 gaylords (*i.e.*, pallet-sized, cardboard containers) or other containers of CRT tubes, "processed" or crushed CRT glass, and other e-waste that were speculatively accumulated and abandoned at the Property.

> (i) **BAN Warns the Arranger/Transporter Defendants that Defendant Closed Loop Lacked a Clear Pathway to Compliance.**

98.     The Basel Action Network ("BAN") is an environmental non-profit group that describes itself as an investigative watchdog for sham electronic waste recyclers.

99.     On or about January 22, 2013, Closed Loop Glass Solutions, LLC applied for an air quality permit-to-install a glass furnace to recycle processed CRT glass in connection with Defendant Closed Loop operations in Ohio.

100.     On or about September 26, 2013, BAN provided public comments in response to the air permit application in which it expressed concerns with the risk of speculative accumulation and sham recycling that would arise from Defendant Closed Loop's conduct:

> "This is an important matter because an influx of cash comes into a business of this kind upon receipt of CRT glass and the actual subsequent processing of the CRTs is a very large subsequent expense. The economic temptation to avoid latter [sic] costs, in the face of large influxes of cash is real and thus holding to Speculative Accumulation rules is vital unless there is a clear pathway for meeting the processing goals, and avoiding accumulation is seen as a reality in the near-term. Already numerous CRT storage-for-later processing sites around the nation have been found abandoned with massive amounts of glass still on site due to this factor (see Luminous Recycling, Denver, Dow Management, Yuma)."

101.     BAN's public statements regarding the Defendant Closed Loop situation were widely disseminated and, upon information and belief, were known to participants in the industry, including the Arranger/Transporter Defendants.

102.     The Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they were aware or should have been aware of BAN's public warning regarding the "economic temptation" for Defendant Closed Loop to

circumvent the speculative accumulation requirements in exchange for "large influxes of cash."

103. For the next three (3) years, the Arranger/Transporter Defendants nevertheless knowingly transported and/or arranged for the transport of tens of millions of pounds of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

> **(ii)** **Defendant Closed Loop Seeks to Protect Its Scheme When Ohio EPA Begins to Express Concerns Regarding Speculative Activity.**

104. In 2014, Ohio EPA began expressing concerns with Defendant Closed Loop's ability to meet speculative accumulation requirements. These concerns were due, at least in part, of the large amounts of CRTs at Closed Loop's facility on Watkins Road.

105. Upon information and belief, Defendant Closed Loop was withheld information regarding speculative accumulation from Ohio EPA and/or took other actions to conceal or obscure its failure to avoid speculative accumulation of CRTs and CRT glass.

106. Defendant Closed Loop continued to accept inbound CRTs and other e-waste at Closed Loop facilities in Ohio, including the Property, for the next 15-17 months, despite existing market conditions and despite knowing that Defendant Closed Loop was or would be out of compliance with speculative accumulation requirements.

> **(iii)** **Closed Loop Acknowledged Concerns with Speculative Accumulation, Yet Continued to Accept Inbound CRTs for Profit.**

107. On or about November 6, 2014, E-Scrap News reported that Mr. Brent Benham, an officer of Defendant Closed Loop, admitted that "Closed Loop has been amassing leaded glass instead of sending it downstream for recycling elsewhere because the company is trying to collect sufficient feedstock for its furnace." *See* E-Scrap News, *CRT player Closed Loop receives notice of violation* (Nov. 6, 2014).

108. On or about December 9, 2014, Defendant Closed Loop acknowledged to Ohio EPA in a letter that it "did not give greater attention to speculative accumulation prior to October 2014," effectively admitting that it failed to comply with the speculative accumulation requirement in the CRT conditional exclusion – the very exclusion upon which Defendant Closed Loop's entire e-waste recycling business model was predicated.

109. Nevertheless, Defendant Closed Loop continued to accept inbound CRTs and other e-waste at Closed Loop facilities in Ohio into March of 2016.

### b. Feasible Means of Being Recycled

110. As noted above, the qualifying criteria for the CRT conditional exclusion include, *inter alia*, a prohibition on "speculative accumulation," which includes two components. 40 C.F.R. §261.39(a)(4) & (c). The first component is discussed above in Section 1a.

111. The second component of the CRT conditional exclusion requires a demonstration that "the material is potentially recyclable and has a feasible means of being recycled."

112. It appears that Closed Loop's initial business plan was to install a furnace at one of its facilities in Ohio. Such furnace, once installed and operating would be used to separate lead from glass. The result would be the recovery of two (2) separate products--

lead and "clean" glass. The market for those two (2) separate products would be greater. Defendant Closed Loop failed to install a furnace and its failure to do so was directly contrary to its business plan. In addition, Closed Loop failed to establish any other feasible means of recycling CRTs and other e-waste at its facilities in Ohio, including the Property. The result is that Closed Loop failed to establish a feasible means of recycling CRTs and other e-waste accepted at its facilities in Ohio, including the Property.

113.    Upon information and belief, and as explained more fully below, the Arranger/Transporter Defendants had the requisite sophistication and experience in the e-waste industry such that they, too, were aware or should have been aware that Defendant Closed Loop lacked the financial wherewithal or willingness to conduct a legitimate recycling operation based upon Closed Loop's announced business plan and Defendant Closed Loop's failure to implement its business plan.

114.    On or about May 6, 2016, Defendant Closed Loop advised Ohio EPA in a letter that Defendant Closed Loop would cease its operations in Columbus, Ohio "due to changing market conditions and financial considerations."

115.    For all of the reasons set forth above, and at all times relevant, Defendant Closed Loop lacked the financial wherewithal and willingness to commit funding to build a furnace that could be used to demonstrate a feasible means of recycling.

### c.    Sham Recycling/Disposal

116.    CRTs and other e-waste that are sham recycled or disposed of are regulated hazardous wastes under RCRA and Ohio Rev. Code Ann. Ch. 3734. *See* 40 C.F.R. §260.4(a)(22)(i) (subjecting used, intact CRTs to regulation if they are "disposed"); Ohio Admin. Code 3745-51-04(A)(22)(a) (same); 40 C.F.R. §261.39(a) & (c) (exempting used,

broken CRTs from regulation only if they are "destined for recycling"); Ohio Admin. Code 3745-51-39(A) and (C) (same); 40 C.F.R. §261.2 (subjecting "discarded" materials to regulation, including materials that are disposed, abandoned, accumulated, or reclaimed); and Ohio Admin. Code 3745-51-02 (same).

117.    RCRA requires that the recycling of hazardous secondary materials for purposes of complying with the CRT conditional exclusion be "legitimate," or else the materials are deemed hazardous wastes, and that "[s]ham recycling is recycling that is not legitimate recycling." *See* 40 C.F.R. §§260.43 & 261.2(g).

118.    The leaded funnel glass and panel glass removed from CRTs and otherwise generated in CRT processing constitute "hazardous secondary materials," within the meaning of 40 C.F.R §260.43.

119.    Defendant Closed Loop disposed of CRT glass fed into one or more mechanical crushers and placing such CRT glass in the Closed Loop facilities in Ohio, including the Property, indefinitely with the intent to abandon it, which Defendant Closed Loop ultimately did in early 2016.

120.    U.S. EPA has looked to a variety of factors in determining whether a material is a legitimate product as opposed to a waste and whether the recycling process is legitimate as opposed to sham recycling or disposal.

121.    These factors include whether a legitimate market exists for the material, whether the material provides revenues, and whether the material is managed to prevent release (*i.e.*, managed as a valuable commodity). *See, e.g.,* 40 C.F.R. §260.43 (setting forth required criteria to demonstrate legitimate recycling); *id*. §261.2(e)(1) (describing materials that are not solid wastes when recycled); *id*. §261.2(g) (prohibiting sham

recycling); EPA Faxback 13691 (May 19, 1994); EPA Faxback 11750 (June 2, 1993); and EPA Faxback 11936 (Jan. 31, 1995). *See* also Ohio Admin. Code 3745-51-06 (setting forth requirements for recyclable materials).

122.    Defendant Closed Loop violated the prohibition against sham recycling by failing to demonstrate that:

a.    the crushing of commingled leaded funnel glass and panel glass provided a useful contribution to the recycling process;

b.    the crushed commingled leaded funnel glass and panel glass was a valuable product or intermediate;

b.    a legitimate market existed for the crushed CRT glass that was being generated;

c.    the CRTs and crushed CRT glass that were accumulating at Closed Loop facilities in Ohio, including the Property were being managed as valuable commodities; and

d.    the CRTs and crushed CRT glass that were accumulating at Closed Loop facilities in Ohio, including the Property, were being managed so as to prevent a release.

123.    No legitimate market existed for the crushed CRT glass that Defendant Closed Loop was generating given the manner in which it was generated:

a.    It is standard industry practice to segregate leaded funnel glass from panel glass during CRT processing to meet the product specifications of downstream lead smelters.

b.    It is not economically viable for lead smelters to accept commingled glass from e-waste recyclers, given the need to run over twice as much feedstock (glass) to extract the same amount of lead.

c.    Nor did commingled glass meet the product specifications for other downstream recyclers, including Camacho Recycling, as evidenced by a May 7, 2015 letter from Comacho Recycling to Mr. Cauchi.

d.    Defendant Closed Loop failed to segregate leaded funnel glass from panel glass, as evidenced by the enormous number of gaylords of used, broken, and commingled CRT glass that were abandoned at Closed Loop facilities in Ohio, including the Property.

e.    On or about November 19, 2014, Defendant Closed Loop misrepresented to Ohio EPA in a meeting that it had been processing CRTs to separate the nonhazardous front (panel) glass from the hazardous funnel glass, as reflected in an internal Ohio EPA communication.

f.    On or about May 22, 2015, Defendant Closed Loop again misrepresented to Ohio EPA in response to an information request that "[w]hen CRTs are processed they are separated into Panel Cullet, Funnel Glass, Metals, Plastics and glass fines."

124.    No legitimate market existed for the pre-processed CRT glass that Defendant Closed Loop received from the Arranger/Transporter Defendants given that the CRT glass alone has a "negative net value."

125.    Nor did Defendant Closed Loop manage the crushed CRT glass in an environmentally responsible manner with a concern for product integrity, as confirmed by the following:

a.    It is standard industry practice to use new octagon Gaylord boxes to provide appropriate containment for processed CRT glass, which averages 2 tons per Gaylord.

b.    Defendant Closed Loop repurposed many of the same four-sided Gaylord boxes that had previously been used to transport used, intact CRTs to the Properties.

c.    These boxes had, in turn, been repurposed from their initial use to package non-hazardous consumer products, which do not require the same standard of durability.

d.    As a result, crushed CRT glass has spilled to the floor of the Property.

e.    Defendant Closed Loop's failure to qualify for the CRT conditional exclusion is evidenced by historical practices of the Defendant Closed Loop as evidenced by inspections and other actions undertaken by the Ohio EPA.

126.    U.S. EPA has observed that "storing broken CRTs outdoors prior to processing is inconsistent with the premise that these materials are commodity-like." 71 Fed. Reg. 42,928, 42,933 (July 28, 2006).

127.    For all of the reasons set forth above, the manner in which Defendant Closed Loop processed CRT glass and otherwise managed inbound CRTs evidenced the fact that it had no intention of actually recycling these materials as though they were

valuable commodities with a legitimate downstream market to receive them. Thus, Defendant Closed Loop violated the sham recycling prohibition in 40 C.F.R. §260.43.

### d. State of Ohio Environmental Enforcement

128. The Ohio EPA issued a notice of violation ("NOV") to Defendant Closed Loop on April 11, 2016, alleging that Defendant Closed Loop failed to qualify for the CRT conditional exclusion at the Property.

129. The April 11, 2016 NOV was at least the fourth NOV Defendant Closed Loop had received for violations of Ohio hazardous waste and air quality laws during its operations at the Property or at other Closed Loop facilities located in Ohio.

130. The April 11, 2016 NOV alleged, *inter alia*, that Defendant Closed Loop: (a) failed to demonstrate that it was not speculatively accumulating CRTs or processed CRTs; (b) was not operating a "legitimate recycling facility"; (c) "did not have a feasible means of recycling"; and (d) "illegally transported a hazardous waste under Ohio's hazardous waste laws to an unpermitted facility."

131. Ohio EPA further indicated in the April 11, 2016 NOV that it was referring the matter to Ohio EPA's Division of Materials and Waste Management's hazardous waste enforcement coordinator for enforcement consideration.

132. Olymbec was copied on the April 11, 2016 NOV issued by Ohio EPA to Defendant Closed Loop.

133. On or about May 13, 2016, Ohio EPA confirmed in a meeting with representatives of Olymbec that Ohio EPA views Olymbec liable as the owner of a hazardous waste facility and that Ohio EPA considers Olymbec liable for clean-up costs and other corrective actions at the Property.

134. On or about September 9, 2016, Ohio EPA sent a letter requesting the Attorney General of Ohio ("Ohio AG") to initiate "all necessary legal and/or equitable civil actions as may be deemed necessary and seek appropriate penalties against [Defendant Closed Loop] *and other appropriate persons* for the violations of ORC Chapter 3734 and the rules adopted thereunder." (Emphasis added).

135. On or about May 17, 2017, the Ohio AG sent a letter to Olymbec advising Olymbec that it, as the owner of the Property, has committed violations of Ohio's hazardous waste laws and rules. Although no formal enforcement action has been filed against Olymbec by or on behalf of the Ohio EPA, the Ohio EPA still maintains that Olymbec is a liable party simply as a result of its ownership of the portion of warehouse facility at the Property that was the location of Closed Loop operations. Olymbec has not settled any actual alleged liability with Ohio that it may have regarding the Property.

136. Olymbec has been cooperating with the Ohio AG and Ohio EPA investigation. Olymbec has undertaken efforts to investigate the nature and quantity of the abandoned CRTs and other e-waste at the Property; to protect public health and safety; and to address releases and threatened releases. All costs incurred to date, for which recovery is sought herein, are consistent with the U.S. EPA National Contingency Plan ("NCP") at 40 C.F.R. Part 300, in keeping with 42 U.S.C. §9607. These efforts have included, but are not limited to:

   a. arranging for the retention of an environmental consultants which have performed site inspections and assessments, and records reviews in accordance with 40 C.F.R. § 300.410, *inter alia*, (i) to characterize the nature and extent of the abandoned CRTs, CRT glass, and other e-waste at

the Property, (ii) to identify sources and the nature of releases and threatened releases, (iii) to evaluate the magnitude of the threat, and (iv) to evaluate the factors necessary to determine whether a removal is necessary;

b.    identifying potential options and locations for the recycling or, if necessary, disposal of the abandoned CRTs, CRT glass, and other e-waste in furtherance of 40 C.F.R. §300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

c.    obtaining cost estimates from potential hazardous and electronic waste vendors for the recycling and/or disposal of the abandoned CRTs, CRT glass, and other e-waste and for removal and/or remedial actions at the Property in furtherance of 40 C.F.R. §300.415(b)(4)(i) and in accordance with other applicable federal and state laws;

d.    securing the Property to prevent unauthorized entry in accordance with 40 C.F.R. §300.415(b)(1)-(3) and (e)(1).

e.    directing an environmental consulting firm  to prepare a health and safety plan in accordance with 40 C.F.R. §300.150 to inform personnel participating in on-site activities at the Property, including contractors accessing the Property, of the known or reasonably anticipated potential hazards and safety concerns; and

g.    preparing documentation in accordance with 40 C.F.R. §300.160(a)(1), *inter alia*, (i) to identify responsible parties, (ii) to describe the source and circumstances of the releases, and (iii) to provide for an accounting of response costs.

## 2. The Arranger/Transporter Defendants

137. The Arranger/Transporter Defendants participated in and profited from Defendant Closed Loop's e-waste recycling scheme.

138. The Arranger/Transporter Defendants selected Defendant Closed Loop as the cheapest and/or most convenient possible option on the market to receive and ostensibly "recycle" CRTs and other e-waste.

139. The Arranger/Transporter Defendants either knew or should have known that Defendant Closed Loop lacked the capacity to qualify for the CRT conditional exclusion at the time the arrangements were made to transport the CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, and at the time the CRTs and other e-waste were accepted for transport to Closed Loop facilities in Ohio, including the Property.

140. The Arranger/Transporter Defendants benefited from the delay tactics that Defendant Closed Loop implemented to hold Ohio EPA and others at bay.

141. With the requisite experience and sophistication in the tightknit e-waste industry, the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because the Arranger/Transporter Defendants knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and was using them in a manner constituting disposal.

142. There is widespread and long-standing recognition in the e-waste recycling industry regarding concerns with e-waste abandonment, including concerns that were known or should have by known by the Arranger/Transporter Defendants.

143. Several recent e-waste abandonments and related environmental enforcement actions have been widely reported in the media, and any participant in the e-waste recycling market would have been well aware of the trend, including the Arranger/Transporter Defendants.

144. The fact that Defendant Closed Loop was stockpiling CRTs at its facilities in Ohio, including the Property, in violation of speculative accumulation requirements was widely known in the e-waste industry for several years prior to 2016 and was known or should have been known by the Arranger/Transporter Defendants.

145. The fact that Defendant Closed Loop was otherwise not operating in compliance with federal and state hazardous waste laws was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants.

146. The fact that Defendant Closed Loop did not have a glass furnace (a critical component of Defendant Closed Loop's business plan) was widely known in the e-waste industry for several years and was known or should have been known by the Arranger/Transporter Defendants.

147. There were few, if any, other glass furnaces operating in North America, a fact that was known or should have been known by the Arranger/Transporter Defendants.

148. The fact that Defendant Closed Loop lacked adequate downstream markets to manage processed CRT glass was widely known in the e-waste industry for several years because it directly impacted the revenue streams of nearly every entity involved in the CRT recycling chain, including the Arranger/Transporter Defendants.

149.    The Arranger/Transporter Defendants transported and/or arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, despite the fact that they knew or should have known that Defendant Closed Loop lacked the capacity to qualify for the CRT conditional exclusion.

### a.    Federal Prison Industries, Inc. d/b/a UNICOR

150.    Records produced by Defendant Closed Loop indicate that Defendant UNICOR arranged for the transport CRTs and other e-waste to the Closed Loop facilities in Ohio, including the Property, starting in or around May 2012 and extending into or around December 2015.

151.    Records produced by Defendant Closed Loop indicate that Defendant UNICOR arranged for the transport of these CRTs and other e-waste to the Closed Loop facilities in Ohio from at least four (4) different locations.  At least one (1) gaylord of CRTs, originating with UNICOR, is located at the Property.

152.    Records produced by Closed Loop indicate that, among other e-waste streams, Defendant UNICOR arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "Scrap-Glass," which has a negative net value.

153.    Defendant UNICOR and Defendant Closed Loop entered into a series of contracts to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, for as low as $0.0750 per pound.

154.    Defendant UNICOR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant UNICOR

knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

155. Particularly in light of the extensive scrutiny from the Department of Justice Office of the Inspector General, Defendant UNICOR had the sophistication and experience in the e-waste industry necessary to ascertain the true nature of Defendant Closed Loop's sham recycling operations. Furthermore, in late 2014, a competitor of Defendant Closed Loop e-mailed Defendant UNICOR, advising them that Defendant Closed Loop "does not recycle the funnel glass" and was not running a legitimate end-use e-waste recycling operation.

156. Defendant UNICOR, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

157. Nevertheless, Defendant UNICOR continued to ship CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, to take advantage of Defendant Closed Loop's artificially low prices.

158. At all times relevant, Defendant UNICOR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant UNICOR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

41

159. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant UNICOR selected Defendant Closed Loop as its downstream e-waste "recycler," arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

### b. The Kuusakoski Defendants

160. Records of the Defendant Closed Loop indicate that Defendants Kuusakoski Recycling, Kuusakoski US LLC (via VTKK, LLC), Vintage Tech and other entities controlled or related to Kuusakoski US LLC (hereinafter collectively referred to as the "Kuusakoski Defendants"), arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, representing a significant amount of e-waste abandoned at Closed Loop facilities in Ohio, including the Property.

161. The Kuusakoski Defendants and Defendant Closed Loop entered into a series of contracts to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

162. The Kuusakoski Defendants knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, the Kuusakoski Defendants knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

163. The Kuusakoski Defendants were the highest volume shippers to Defendant Closed Loop.

164. The Kuusakoski Defendants had the sophistication and experience in the e-waste industry necessary to ascertain that Defendant Closed Loop was not running a legitimate recycling operation.

165. The Kuusakoski Defendants have asserted that they have "deep industry expertise," that they have "streamlined [their] processes to be among the best in the world," and that they "cover 48 states in the U.S., with processing facilities on the East Coast and centrally in the mid-West." *See* http://www.kuusakoski.us/our-services/e-scrap-processing/.

166. Nevertheless, the Kuusakoski Defendants failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law, including whether Defendant Closed Loop qualified for the CRT conditional exclusion.

167. At all times relevant, the Kuusakoski Defendants knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because the Kuusakoski Defendants knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

168. Enticed by the artificially low prices offered by a sham recycling operation, the Kuusakoski Defendants selected Defendant Closed Loop as their downstream e-waste "recycler," arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

    **c.**    **The Other Arranger/Transporter Defendants**

    **1.**    **Defendant Accurate IT**

43

169.     Records produced by Defendant Closed Loop indicate that Defendant Accurate IT arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

170.     Defendant Accurate IT entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0725 per pound.

171.     Defendant Accurate IT knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Accurate IT knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

172.     Defendant Accurate IT failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

173.     Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Accurate IT arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "mixed broken glass", which has a negative net value.

174.    Defendant Accurate IT has asserted that "[a]ll downstream vendors are scrutinized to ensure applicable permits, licenses, and certifications associated with recycling."

175.    Nevertheless, Defendant Accurate IT continued to ship vast quantities of CRTs and other e-waste to the Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

176.    At all times relevant, Defendant Accurate IT knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Accurate IT knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

177.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Accurate IT selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

### 2.    Defendant ATR

178.    Records produced by Defendant Closed Loop indicate that Defendant ATR arranged for the transport of CRTs and other e-waste to Closed Loop's facilities in Ohio starting in or around June 2015 and extending into or around February 2016.

179.    Defendant ATR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0900 per pound.

180.     Defendant ATR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ATR knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

181.     Defendant ATR, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

182.     Defendant ATR has asserted that it is an "industry leader for E-waste management in the US." *See* https://wmsbf.org/members/advanced-technology-recycling/. Nevertheless, Defendant ATR continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

183.     At all times relevant, Defendant ATR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ATR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

184.     Enticed by the artificially low prices offered by a sham recycling operation, Defendant ATR selected Defendant Closed Loop as its downstream e-waste "recycler,"

46

routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately an eight month period.

### 3. Defendant AIM

185. Records produced by Defendant Closed Loop indicate that Defendant AIM arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2013 and extending into or around November 2014.

186. Defendant AIM entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.1000 per pound.

187. Defendant AIM knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant AIM knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

188. Defendant AIM, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

189. Defendant AIM has asserted that it is a "leader in E-Waste Recycling Collection." *See* http://www.aimecycling.com/services/e-waste/. Nevertheless, Defendant

AIM continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

190.    At all times relevant, Defendant AIM knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant AIM knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

191.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant AIM selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 1-2 year period.

### 4.    Defendant American Greenz

192.    Records produced by Defendant Closed Loop indicate that Defendant American Greenz arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around March 2015 and extending into or around December 2015.

193.    Defendant American Greenz entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

194.    Defendant American Greenz knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus,

Defendant American Greenz knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

195. Defendant American Greenz, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

196. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant American Greenz arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "panel," "funnel," "coated panel glass," and/or "coated funnel glass," each of which has a negative net value.

197. Defendant American Greenz has advertised itself as providing "professional collection services that focus on . . . environmentally responsible practices" and striving "to exceed minimum EPA, OSHA, and other local, state and federal requirements." *See* http://americangreenz.com/. Nevertheless, Defendant American Greenz continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

198. At all times relevant, Defendant American Greenz knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant American Greenz knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

49

199.     Enticed by the artificially low prices offered by a sham recycling operation, Defendant American Greenz selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 1-2 year period.

### 5.     Defendant ARI

200.     Records produced by Defendant Closed Loop indicate that Defendant ARI arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around May 2012 and extending into or around January 2014.

201.     Defendant ARI entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0750 per pound.

202.     Defendant ARI knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ARI knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

203.     Defendant ARI, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

204. Defendant ARI has asserted that it is "one of the region's leading 'e-waste' recycling operations." *See* http://www.retroworks.net/. Defendant ARI has readily acknowledged that "[w]ith a couple of easy questions, you can get a good idea what your recycling company is up to" and that "[b]ecause there are relatively few glass furnaces or lead smelters recycling post-consumer CRT glass, it shouldn't be a 'trade secret' where your CRT glass goes." *See* http://www.retroworks.net/Good-Point/CRTGlassTest_final.PDF. Defendant ARI has also readily acknowledged that "EPA could hold you, the generator, liable for cleanup of CRTs dumped or abandoned by a 3rd party recycler" and that "[y]ou have a right to check the CRT glass destination." *See* http://www.retroworks.net/Good-Point/CRTGlassTest_final.PDF.

205. Defendant ARI apparently never bothered to check the "CRT glass destination" for the CRTs and other e-waste it had transported or arranged to transport to the Closed Loop facilities in Ohio to determine whether or not such CRTs and other e-waste would be recycled.

206. Nevertheless, Defendant ARI continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

207. At all times relevant, Defendant ARI knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ARI knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

208.     Enticed by the artificially low prices offered by a sham recycling operation, Defendant ARI selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio.

### 6.     Defendant ARG

209.     Records produced by Defendant Closed Loop indicate that Defendant ARG arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around April 2012 and extending into or around November 2012.

210.     Defendant ARG entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0875 per pound.

211.     Defendant ARG knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ARG knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

212.     Defendant ARG failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

213.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant ARG arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "load of glass," funnel glass," broken glass," and "coated funnel glass," each of which has a negative net value.

214.    At all times relevant, Defendant ARG knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant ARG knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

215.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant ARG selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately an eight month period.

### 7.    Defendant C2

216.    Records produced by Defendant Closed Loop indicate that Defendant C2 arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around May 2014 and extending into or around February 2016.

217.    Defendant C2 entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

218.    Defendant C2 knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be

sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant C2 knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

219.    Defendant C2, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

220.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant C2 arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "mirror glass" and "flat panel glass only," each of which has a negative net value.

221.    Defendant C2 continued to arrange for the transport of CRTs and other e-waste the Properties even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

222.    Defendant C2 has asserted that it is an "industry leader" and an "expert[] in e-waste recycling." *See* http://www.tryc2.com/.

223.    Nevertheless, Defendant C2 continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

224.    At all times relevant, Defendant C2 knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant C2 knew or should have known that Defendant Closed Loop was speculatively

accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

225.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant C2 selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over nearly a two year period.

### 8.    Defendant Cohen

226.    Records produced by Defendant Closed Loop indicate that Defendant Cohen arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around May 2013 and extending into or around June 2015.

227.    Defendant Cohen entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0850 per pound.

228.    Defendant Cohen knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Cohen knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

229.    Defendant Cohen, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and

whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

230.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Cohen arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "coated funnel glass," "clean panel glass," "skids-glass," "pallets-glass," "mixed glass," and "broken glass," each of which has a negative net value.

231.    Defendant Cohen has asserted that it its "strict downstream auditing process ensures all materials are handled properly" and "guarantees your electronics are recycled in a safe, effective manner." *See* http://cohenusa.com/electronics-recycling.

232.    Nevertheless, Defendant Cohen continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, to take advantage of Defendant Closed Loop's artificially low prices.

233.    At all times relevant, Defendant Cohen knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Cohen knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

234.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Cohen selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a two year period.

### 9. Defendant CRS

235. Records produced by Defendant Closed Loop indicate that Defendant CRS arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, starting in or around April 2015 and extending into or around December 2015.

236. Defendant CRS entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

237. Defendant CRS knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant CRS knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

238. Defendant CRS, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

239. Defendant CRS has asserted that it has "over 50 years of combined industry experience, ensuring the ability to properly service and create the recycling solution required for anyone." *See* http://www.crsrecycle.com/about.html.

240. Nevertheless, Defendant CRS continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

241. At all times relevant, Defendant CRS knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CRS knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

242. Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendant CRS selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, over approximately a nine month period.

**10. Defendant Comprenew**

243. Records produced by Defendant Closed Loop indicate that Defendant Comprenew arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, starting in or around July 2015 and extending into or around February 2016.

244. Defendant Comprenew entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

245. Defendant Comprenew knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing

market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Comprenew knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

246. Defendant Comprenew, however, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

247. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Comprenew selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, over approximately an eight month period.

### 11. Defendant CompuPoint

248. Records produced by Defendant Closed Loop indicate that Defendant CompuPoint arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around October 2012 and extending into or around January 2016.

249. Defendant CompuPoint entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

250. Defendant CompuPoint knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing

market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant CompuPoint knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

251. Defendant CompuPoint failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

252. Defendant CompuPoint has asserted that it conducts "downstream due diligence on all vendors handling focus materials to ensure materials are handled properly throughout the chain of custody" and that it "eliminate[s] the risks associated with electronics recycling by managing the entire asset disposition process from collection to final destination." *See* http://www.compupointusa.com/why-choose-a-r2-certified-facility/ and http://www.compupointusa.com/about-us.

253. Nevertheless, Defendant CompuPoint continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

254. At all times relevant, Defendant CompuPoint knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CompuPoint knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

255.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant CompuPoint selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 3-4 year period.

### 12.    Defendant CRV

256.    Records produced by Defendant Closed Loop indicate that Defendant CRV arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around July 2015 and extending into or around February 2016.

257.    Defendant CRV entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0900 per pound.

258.    Defendant CRV knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant CRV knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

259.    Defendant CRV, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

260. At all times relevant, Defendant CRV knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CRV knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

261. Enticed by the artificially low prices offered by a sham recycling operation, Defendant CRV selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately an eight month period.

### 13. Defendant Dynamic

262. Records produced by Defendant Closed Loop indicate that Defendant Dynamic arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around January 2013 and extending into or around March 2016.

263. Defendant Dynamic entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0750 per pound.

264. Defendant Dynamic knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Dynamic knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

265. Defendant Dynamic failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

266. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Dynamic arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "coated funnel glass," which has a negative net value.

267. Defendant Dynamic continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

268. Defendant Dynamic was well aware of industry-wide concerns with the speculative accumulation of e-waste, having itself acquired the assets of Wisconsin-based Materials Processing Corporation ("MPC") in or around August 2015, in the wake of MPC's shutdown in response to state fines for stockpiling CRTs.

269. Defendant Dynamic has asserted that it is "an industry leader" and provides a "guarantee to you, the customer, that all of your electronic equipment and materials are recycled properly." *See* https://dynamicrecycling.com/electronics-recycling/.

270. On at least three separate occasions, Defendant Dynamic and Defendant Closed Loop exchanged information that should have led Defendant Dynamic to conclude that Defendant Closed Loop was violating the CRT conditional exclusion. Nevertheless, Defendant Dynamic continued to ship vast quantities of CRTs and other e-waste to Closed

Loop facilities in Ohio for an additional seven months to take advantage of Defendant Closed Loop's artificially low prices.

271.    At all times relevant, Defendant Dynamic knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant CRV knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal

272.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Dynamic selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a three year period.

### 14.    Defendant eCycle

273.    Records produced by Defendant Closed Loop indicate that Defendant eCycle arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2012 and extending into or around September 2015.

274.    Defendant eCycle entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

275.    Defendant eCycle knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant eCycle knew or should have known that Defendant Closed Loop was not running a legitimate

recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

276.    Defendant eCycle failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

277.    The transactions for many of the CRTs and e-waste that Defendant eCycle arranged to be transported to Closed Loop facilities in Ohio were brokered in collusion with Defendant E-World, whose CEO, upon information and belief, is serving time in federal correctional system residential re-entry center for e-waste fraud.

278.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eCycle arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "cullet," and "broken glass," each of which has a negative net value.

279.    Defendant eCycle has asserted on its website that it is an "industry leading electronics recycling company," and that "you are assured that your equipment, including servers, PCs, monitors, televisions, telecom systems, cell phones/smart phones and medical        equipment        will        be        managed        responsibly." *See* http://www.ecyclesecure.com/ElectronicsRecycling.html.

280.    Nevertheless, Defendant eCycle continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

281. On or about April 25, 2014, E-Scrap News reported that Defendant eCycle provided bills of lading to the North Carolina Department of Environment and Natural Resources that confirmed the shipments of approximately 317 tons (634,000 pounds) to Closed Loop facilities in Ohio from Defendant eCycle's warehouse at 1236 Industrial Avenue in Gastonia, North Carolina as of April 25, 2014, and that Defendant eCycle was continuing to send large amounts of processed CRT glass to downstream recipients to avoid running afoul of its own federal speculative accumulation requirements.

282. At all times relevant, Defendant eCycle knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eCycle knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

283. Enticed by the artificially low prices offered by a sham recycling operation, Defendant eCycle selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a three year period.

### 15. Defendant eLot

284. Records produced by Defendant Closed Loop indicate that Defendant eLot arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio in or around April 2015.

285. Defendant eLot entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

286.    Defendant eLot knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant eLot knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

287.    Defendant eLot, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

288.    At all times relevant, Defendant eLot knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eLot knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

289.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant eLot selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a one month period.

### 16.  Defendant ECSR

290.  Records produced by Defendant Closed Loop indicate that Defendant ECSR arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2012 and extending into or around July 2014.

291.  Defendant ECSR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

292.  Defendant ECSR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant ECSR knew or should have known that Defendant Closed Loop was running a sham recycling scheme, but chose to do business with it anyway in an attempt to benefit from its misconduct.

293.  Defendant ECSR, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

294.  Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant ECSR arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass," which has a negative net value.

295.  At all times relevant, Defendant ECSR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because

Defendant ECSR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

296.     Enticed by the artificially low prices offered by a sham recycling operation, Defendant ECSR selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a three (3) year period.

### 17.     Defendant eRevival

297.     Records produced by Defendant Closed Loop indicate that Defendant eRevival arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around July 2014 and extending into or around October 2015.

298.     Defendant eRevival entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0750 per pound.

299.     Defendant eRevival knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant eRevival knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

300.     Defendant eRevival failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether

Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

301.    Defendant eRevival has asserted that it is "one of the leading electronics and computer recycling companies in the east coast." *See* http://www.erevival.net/.

302.    Nevertheless, Defendant eRevival continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

303.    At all times relevant, Defendant eRevival knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eRevival knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

304.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant eRevival selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for over approximately a one (1) year.

**18.    Defendant eWaste Recycling**

305.    Records produced by Defendant Closed Loop indicate that Defendant eWaste Recycling arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around August 2012 and extending into or around March 2013.

306. Defendant eWaste Recycling entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0825 per pound.

307. Defendant eWaste Recycling knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eWaste Recycling knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

308. Defendant eWaste Recycling, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

309. The transactions for many of the CRTs and e-waste that Defendant eWaste Recycling arranged to be transported to Closed Loop facilities in Ohio were brokered in collusion with Defendant E-World, whose CEO is serving time in federal correctional system residential re-entry center for e-waste fraud.

310. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eWaste Recycling arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "leaded cullet," broken glass," and "coated funnel glass," each of which has a negative net value.

311.    Defendant eWaste Recycling has asserted that it has "55 years combined experience in the electronics recycling industry" and "utilizes only responsible recycling practices." *See* http://www.ewastemaine.com/about.html.

312.    Nevertheless, Defendant eWaste Recycling continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

313.    At all times relevant, Defendant eWaste Recycling knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant eWaste Recycling knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

314.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant eWaste Recycling selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately an eight (8) month period.

### 19.    Defendant eWorks

315.    Records produced by Defendant Closed Loop indicate that Defendant eWorks arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around January 2016 and extending into or around February 2016.

316.    Defendant eWorks entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.1050 per pound.

317. Defendant eWorks knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant eWorks knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

318. Defendant eWorks, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

319. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant eWorks arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," which has a negative net value.

320. Defendant eWorks has asserted that "[a]ll equipment is processed in accordance with today's strict electronic waste standards." *See* http://www.eworksesi.org/.

321. Nevertheless, Defendant eWorks continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

322. At all times relevant, Defendant eWorks knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because

Defendant eWorks knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

323. Enticed by the artificially low prices offered by a sham recycling operation, Defendant eWorks selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a two (2) month period.

### 20. Defendant E-World and Defendant Erie

324. Records produced by Defendant Closed Loop indicate that Defendants E-World and Erie arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2012 and extending into or around November 2014.

325. Defendant E-World entered into a series of contracts with Defendant Closed Loop, as well with certain Arranger/Transporter Defendants, to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

326. Defendants E-World and Erie knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendants E-World and Erie knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

327. Defendants E-World and Erie failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

328. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendants E-World and Erie arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "leaded cullet," "broken glass," mixed co-mingled," "leaded glass," "coated funnel glass," and "broken mixed glass," each of which has a negative net value.

329. Defendant E-World's LinkedIn profile has indicated that "E-World specializes in effectively managing the environmental and social responsibilities of end of life electronic equipment."

330. Defendant Erie's LinkedIn profile has indicated that he is "one of the most well known and active leaders in the U.S. electronic waste and recycling industry" and that his "vision and subsequent implementation have created partnerships across the globe all geared toward the greening of the electronics industry by reducing the carbon footprint, creating local jobs, and minimizing the costs for environmentally sound recycling."

331. On or about February 26, 2014, Defendant E-World e-mailed the Closed Loop Defendants stating "[w]e look forward to the furnace hopefully next year," which confirmed Defendant E-World's understanding that Defendant Closed Loop had no feasible means of recycling at that time.

332.    Nevertheless, Defendant E-World continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

333.    Defendants E-World and Erie have a history of illegal activity arising out of the provision of e-waste recycling services.

334.    At all times relevant, Defendants E-World and Erie knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendants E-World and Erie knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

335.    Nevertheless, enticed by the artificially low prices offered by a sham recycling operation, Defendants E-World and Erie selected Defendant Closed Loop as their downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 3-4 year period.

### 21.    Defendant GEEP and Defendant GEEP USA

336.    Records produced by Defendant Closed Loop indicate that Defendants GEEP and GEEP USA arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, starting in or around September 2012 and extending into or around May 2015.

337.    Defendants GEEP and GEEP USA entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0875 per pound.

76

338. Defendants GEEP and GEEP USA knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

339. Defendants GEEP and GEEP USA failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

340. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendants GEEP and GEEP USA arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass from monitors," "computer scrap (glass)," and "leaded glass," each of which has a negative net value.

341. Defendants GEEP and GEEP USA has asserted that they are a "leading provider of cost effective, environmentally responsible electronics waste recycling." *See* http://www.geepglobal.com/services/end-of-life-recycling/.

342. On or about December 10, 2014, Defendant GEEP USA advised Defendant Closed Loop that "until further notice Closed Loop is not an approved facility for any material," which the author of the communication believed was "due to the issues and violations that were issued at your AZ facility recently."

343. Nevertheless, Defendants GEEP USA continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, to take advantage of Defendant Closed Loop's artificially low prices.

344. At all times relevant, Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendants GEEP and GEEP USA knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

345. Enticed by the artificially low prices offered by a sham recycling operation, Defendants GEEP and GEEP USA selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, over approximately a 2-3 year period.

## 22. Defendant Great Lakes

346. Records produced by Defendant Closed Loop indicate that Defendant Great Lakes arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around September 2015 and extending into or around February 2016.

347. Defendant Great Lakes entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0900 per pound.

348. Defendant Great Lakes knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be

sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Great Lakes knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

349. Defendant Great Lakes failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

350. Defendant Great Lakes continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

351. Defendant Great Lakes has asserted that it "has years of experience performing environmentally friendly recycling of electronic products . . .[, and] electronic recycling is our specialty." *See* https://www.ewaste1.com.

352. Nevertheless, Defendant Great Lakes continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

353. At all times relevant, Defendant Great Lakes knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Great Lakes knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

354. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Great Lakes selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a six month period.

### 23. Defendant Green Chip

355. Records produced by Defendant Closed Loop indicate that Defendant Green Chip arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around August 2013 and extending into or around April 2014.

356. Defendant Green Chip entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.1000 per pound.

357. Defendant Green Chip knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Green Chip knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

358. Defendant Green Chip, failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

359. At all times relevant, Defendant Green Chip knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Chip knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

360. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Chip selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a nine month period.

### 24. Defendant Green Tech

361. Records produced by Defendant Closed Loop indicate that Defendant Green Tech arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2015 and extending into or around September 2015.

362. Defendant Green Tech entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

363. Defendant Green Tech knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Green Tech knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

364. Defendant Green Tech failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

365. Defendant Green Tech "guarantees that all materials we process are re-purposed, either as a whole unit or as bare materials" and that "[a]ll equipment is processed in–house, eliminating third party handlers." *See* http://greentechrecyclers.com/services/recycling.

366. Nevertheless, Defendant Green Tech continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

367. At all times relevant, Defendant Green Tech knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Tech knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

368. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Tech selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a four month period.

### 25.    Defendant Green Wave

369.    Records produced by Defendant Closed Loop indicate that Defendant Green Wave arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around May 2015 and extending into or around December 2015.

370.    Defendant Green Wave entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

371.    Defendant Green Wave knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Green Wave knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

372.    Defendant Green Wave failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

373.    At all times relevant, Defendant Green Wave knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Green Wave knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

374. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Green Wave selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately an eight (8) month period.

### 26. Defendant IMS

375. Records produced by Defendant Closed Loop indicate that Defendant IMS arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, starting in or around February 2014 and extending into or around February 2016.

376. Defendant IMS entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0700 per pound.

377. Defendant IMS knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant IMS knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

378. Defendant IMS failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

379. Defendant IMS continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

380. Defendant IMS has asserted that it provides its customers with "secure processing of electronic waste throughout the recycling chain." *See* http://www.imselectronics.com/about-us/our-policy/.

381. On or about November 12, 2014, in purview of the Wisconsin DNR decision to ban shipments to Defendant Closed Loop from receiving manufacturer credit, Defendant IMS advised Defendant Closed Loop that "[w]e now have a problem in Ohio."

382. Nevertheless, Defendant IMS continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio, to take advantage of Defendant Closed Loop's artificially low prices.

383. At all times relevant, Defendant IMS knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant IMS knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

384. Enticed by the artificially low prices offered by a sham recycling operation, Defendant IMS selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, over approximately a three year period.

## 27.    Defendant Interco

385.    Records produced by Defendant Closed Loop indicate that Defendant Interco arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around October 2015 and extending into or around January 2016.

386.    Defendant Interco entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0900 per pound.

387.    Defendant Interco knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Interco knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

388.    Defendant Interco failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

389.    Thus, at all times relevant, Defendant Interco knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Interco knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

390. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Interco selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a four (4) month period.

### 28. Defendant JD Beavers

391. Records produced by Defendant Closed Loop indicate that Defendant JD Beavers arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in November 2013 and extending into February 2015.

392. Defendant JD Beavers entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0800 per pound.

393. Defendant JD Beavers knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant JD Beavers knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

394. Defendant JD Beavers failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

395.    Defendant JD Beavers has asserted that "[a]s a leader in the scrap metal processing industry, we guarantee a prompt, professional, ethical and environmentally safe approach to handling your material."  See https://www.beaversco.com/1/148/index.asp.

396.    Nevertheless, Defendant JD Beavers continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

397.    At all times relevant, Defendant JD Beavers knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant JD Beavers knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

398.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant JD Beavers selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a fifteen month period.

### 29.    Defendant MRC

399.    Records produced by Defendant Closed Loop indicate that Defendant MRC arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around October 2015 and extending into or around February 2016.

400.    Defendant MRC entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0850 per pound.

401.   Defendant MRC knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant MRC knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

402.   Defendant MRC failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

403.   At all times relevant, Defendant MRC knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant MRC knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

404.   Enticed by the artificially low prices offered by a sham recycling operation, Defendant MRC selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a five month period.

### 30. Defendant Ohio Drop Off

405. Records produced by Defendant Closed Loop indicate that Defendant Ohio Drop Off arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around July 2015 and extending into or around March 2016.

406. Defendant Ohio Drop Off entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0900 per pound.

407. Defendant Ohio Drop Off knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

408. Defendant Ohio Drop Off failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

409. Defendant Ohio Drop Off continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

410. At all times relevant, Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because

Defendant Ohio Drop Off knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

411.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Ohio Drop Off selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a nine (9) month period.

### 31.    Defendant Potomac

412.    Records produced by Defendant Closed Loop indicate that Defendant Potomac arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2015 and extending into or around October 2015.

413.    Defendant Potomac entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0875 per pound.

414.    Defendant Potomac knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Potomac knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

415.    Defendant Potomac failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether

Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

416.    Defendant Potomac has asserted that it conducts "downstream due diligence on all vendors handling focus materials to ensure materials are handled properly throughout the chain of custody" and purportedly warns its potential customers of the increasing prevalence of e-waste abandonments. *See* http://potomacecycle.com/about/.

417.    Nevertheless, Defendant Potomac continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

418.    At all times relevant, Defendant Potomac knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Potomac knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

419.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Potomac selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a five (5) month period.

### 32.    Defendant Quicksilver

420.    Records produced by Defendant Closed Loop indicate that Defendant Quicksilver arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around January 2013 and extending into or around May 2015.

92

421.    Defendant Quicksilver entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0825 per pound.

422.    Defendant Quicksilver knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.    Thus, Defendant Quicksilver knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

423.    Defendant Quicksilver failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

424.    The transactions for many of the CRTs and e-waste that Defendant Quicksilver arranged to be transported to Closed Loop facilities in Ohio were brokered in collusion with Defendant E-World, whose CEO is serving time in federal prison for e-waste fraud.

425.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Quicksilver arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," "mixed broken CRT glass recycling," "mixed co-mingled," and "broken glass," each of which has a negative net value.

426. At all times relevant, Defendant Quicksilver knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Quicksilver knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

427. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Quicksilver selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 2-3 year period.

### 33. Defendant RMG

428. Records produced by Defendant Closed Loop indicate that Defendant RMG arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around November 2012 and extending into or around February 2014.

429. Defendant RMG entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0850 per pound.

430. Defendant RMG knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant RMG knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

94

431.    Defendant RMG failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

432.    Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant RMG arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "glass to be recycled," "broken glass," "lead glass," and/or "coated funnel glass," each of which has a negative net value.

433.    Defendant RMG has asserted that it "has been recycling electronics in New England for more than 15 years." *See* https://www.rmgenterprise.com/recycling-services.

434.    Nevertheless, Defendant RMG continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

435.    At all times relevant, Defendant RMG knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant RMG knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

436.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant RMG selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 1-2 year period.

95

### 34. Defendant RCRR

437. Records produced by Defendant Closed Loop indicate that Defendant RCRR arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in June 2012 and extending into March 2016.

438. Defendant RCRR is second only to the Kuusakoski Defendants in terms of the volume of CRTs and other e-waste arranged to be transported to Closed Loop facilities in Ohio.

439. Defendant RCRR entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

440. Defendant RCRR knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant RCRR knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

441. Defendant RCRR failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

96

442. The transactions for many of the CRTs and e-waste that Defendant RCRR arranged to be transported to Closed Loop facilities in Ohio were brokered in collusion with Defendant E-World.

443. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant RCRR arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass," which has a negative net value.

444. Defendant RCRR continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

445. Defendant RCRR has asserted that it is "the region's foremost leader in EWASTE recycling" and that "[w]e operate our facilities to the highest industry and government standards, and we handle everything from start to finish." *See* http://www.ewaste.com/about-us/why-us/.

446. Nevertheless, Defendant RCRR continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

447. At all times relevant, Defendant RCRR knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant RCRR knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

448.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant RCRR selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 3-4 year period.

### 35.    Defendant Siam

449.    Records produced by Defendant Closed Loop indicate that Defendant Siam arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio in or around February 2013.

450.    Defendant Siam entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

451.    Defendant Siam knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Siam knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

452.    Defendant Siam failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

453. At all times relevant, Defendant Siam knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Siam knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

454. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Siam selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a one month period.

### 36. Defendant Strickland

455. Records produced by Defendant Closed Loop indicate that Defendant Strickland arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around October 2014 and extending into or around February 2016.

456. Defendant Strickland entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.08 per pound.

457. Defendant Strickland knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Strickland knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

458.    Defendant Strickland failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

459.    Nevertheless, Defendant Strickland continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

460.    At all times relevant, Defendant Strickland knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Strickland knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

461.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Strickland selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 1-2 year period.

### 37.    Defendant Sunnking

462.    Records produced by Defendant Closed Loop indicate that Defendant Sunnking arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around October 2014 and extending into or around December 2014.

463.    Defendant Sunnking entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

464. Defendant Sunnking knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant Sunnking knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

465. Defendant Sunnking failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

466. Defendant Sunnking has asserted that it exercises "due diligence in ensuring that downstream recyclers and processors manage recycled materials appropriately, throughout the downstream recycling chain." *See* https://www.sunnking.com/about/about-us/r2-certification/.

467. Nevertheless, Defendant Sunnking continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

468. At all times relevant, Defendant Sunnking knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Sunnking knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

469.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant Sunnking selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a three (3) month period.

### 38.    Defendant TK6

470.    Records produced by Defendant Closed Loop indicate that Defendant TK6 arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, starting in or around April 2015 and extending into or around February 2016.

471.    Defendant TK6 entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.075 per pound.

472.    Defendant TK6 knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant TK6 knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

473.    Defendant TK6 failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

474. Defendant TK6 continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

475. Defendant TK6 assured its customers that it "will ship the E-Waste to one of our downstream vendors where the E-Waste will be thoroughly de-manufactured down to its base commodities and ultimately used as feedstock to manufacture new products." *See* http://www.tk6worldwide.com/services/asset-recovery-and-recycling/.

476. Nevertheless, Defendant TK6 continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

477. At all times relevant, Defendant TK6 knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant TK6 knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

478. Enticed by the artificially low prices offered by a sham recycling operation, Defendant TK6 selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over nearly a one year period.

### 39.    Defendant USB

479. Records produced by Defendant Closed Loop indicate that Defendant USB arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around June 2015 and extending into or around February 2016.

480.    Defendant USB entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.09 per pound.

481.    Defendant USB knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation. Thus, Defendant USB knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

482.    Defendant USB failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

483.    Defendant USB continued to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio even after Defendant Closed Loop's R2 certification was suspended, which occurred on or about February 19, 2016.

484.    Nevertheless, Defendant USB continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

485.    At all times relevant, Defendant USB knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant USB knew or should have known that Defendant Closed Loop was

speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

486.    Enticed by the artificially low prices offered by a sham recycling operation, Defendant USB selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio over approximately a 9 month period.

### 40.    Defendant Waste Commission

487.    Records produced by Defendant Closed Loop indicate that Defendant Waste Commission arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, starting in or around September 2014 and extending into or around February 2016.

488.    Defendant Waste Commission entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0775 per pound.

489.    Defendant Waste Commission knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant Waste Commission knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

490.    Defendant Waste Commission failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable

law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

491. Records produced by Defendant Closed Loop indicate that, among other e-waste streams, Defendant Waste Commission arranged for the disposal of, and paid Defendant Closed Loop to accept, e-waste characterized as "broken mixed glass" and "mixed broken CRT glass," which have a negative net value.

492. Defendant Waste Commission has asserted that it performs "downstream due diligence of potentially hazardous materials to final disposition." *See* http://www.wastecom.com/content/business-industry/electronic-waste.aspx?PF=True.

493. Nevertheless, Defendant Waste Commission continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, to take advantage of Defendant Closed Loop's artificially low prices.

494. At all times relevant, Defendant Waste Commission knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because Defendant Waste Commission knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

495. Enticed by the artificially low prices offered by a sham recycling operation, Defendant Waste Commission selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property, over approximately a 1-2 year period.

### 41.  Defendant We

496.    Records produced by Defendant Closed Loop indicate that Defendant We arranged for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio starting in or around May 2015 and extending into or around August 2015.

497.    Defendant We entered into a series of contracts with Defendant Closed Loop to arrange for the transport of CRTs and other e-waste to Closed Loop facilities in Ohio for as low as $0.0950 per pound.

498.    Defendant We knew or should have known that the artificially low prices being charged by Defendant Closed Loop substantially undercut the prevailing market with a price point that no reasonable industry participant could have believed to be sufficient to cover the costs of a legitimate recycling operation.  Thus, Defendant We knew or should have known that Defendant Closed Loop was not running a legitimate recycling operation, but chose to do business with it anyway in an attempt to benefit from its misconduct.

499.    Defendant We failed to exercise reasonable care to determine whether Defendant Closed Loop was operating in compliance with applicable law and whether Defendant Closed Loop had a feasible means of recycling the millions of pounds of CRTs and other e-waste it was accumulating.

500.    Nevertheless, Defendant We continued to ship vast quantities of CRTs and other e-waste to Closed Loop facilities in Ohio to take advantage of Defendant Closed Loop's artificially low prices.

501.    At all times relevant, Defendant We knew or should have known that Defendant Closed Loop did not qualify for the CRT conditional exclusion, because

Defendant We knew or should have known that Defendant Closed Loop was speculatively accumulating CRTs, had no feasible means of recycling them, and/or was using them in a manner constituting disposal.

502.     Enticed by the artificially low prices offered by a sham recycling operation, Defendant We selected Defendant Closed Loop as its downstream e-waste "recycler," routinely arranging for the transport of CRTs and other e-waste to the Closed Loop facilities in Ohio over approximately a four month period.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

503.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

504.     This claim arises under the provisions of the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, which authorizes this Court to render declaratory judgment as to the allocation of liability for response costs and damages.

505.     An actual, substantial, and justiciable controversy exists between Olymbec and all Defendants regarding their respective rights and obligations for the response costs and/or damages that have been and will be incurred in connection with the release and/or threatened release of hazardous substances at the Property.

506.     Declaratory relief is necessary because, without a ruling on the parties' allocation of liability for response costs and damages, Olymbec would be forced to bring subsequent lawsuits to obtain contribution for future response costs.

507.     The Court also has the authority to enter a judgment on liability for response costs and/or damages under 42 U.S.C. §9613(g)(2), which provides:

"[T]he court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred."

508. Olymbec seeks a declaratory judgment against Defendants under 28 U.S.C. §§2201-2202 and 42 U.S.C. §9613(g), holding all Defendants strictly liable for all of response costs incurred and to be incurred at the Property, which will bind the parties in any subsequent action to recover further response costs or damages.

## SECOND CAUSE OF ACTION

### (CERCLA Cost Recovery)

509. Olymbec repeats and realleges the allegations in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

510. Each Defendant is a "person" as defined by 42 U.S.C. §9601(21).

511. The Property constitutes a "facility" within the meaning of 42 U.S.C. §9601(9).

512. "[H]azardous substance[s]," within the meaning of 42 U.S.C. §9601(14), including, but not limited, to lead, leaded dust, and lead-containing waste, were disposed of at the Property during the period in which Defendant Closed Loop leased and operated the facility at the Property and during the period in which the Arranger/Transporter Defendants transported or arranged to be transported CRTs and other e-waste to Closed Loop facilities in Ohio, including the Property.

109

513.    There have been and continue to be "releases" and/or "threatened releases" of hazardous substances at, on, to or from the Property, within the meaning of 42 U.S.C. §§9601(22) and 9607(a).

514.    CERCLA defines release as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. §9601(22).

515.    The vast majority of the e-waste at the Property consists of used CRT tubes and broken CRT glass, much or all of which was not maintained in appropriate containers and some of which has been released from its initial confinement, spilling to the floor and other areas of the Property as a result.

516.    CRT processing by Defendant Closed Loop, which involved breaking leaded glass and the handling and storage of broken or crushed CRT glass, released hazardous leaded dust.  Hazardous leaded dust became airborne and dispersed throughout the Property and has become attached to or embedded in materials and structures at the Property such as the floors and walls; and hazardous leaded dust has been tracked or otherwise dispersed throughout the Property as a result of operations conducted by Defendant Closed Loop.

517.    A "release" occurred at the Property, regardless of whether the leaded glass or leaded dust escaped from initial confinement, given that Congress expressly defined the term "release" in CERCLA as "including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant."

518.    "[T]hreatened releases" occurred at the Property, because hazardous leaded dust can contaminate articles and personal protective equipment inadvertently removed from the Property; because persons walking through the building can track hazardous leaded dust outside on their shoes and clothing; because damaged bay doors pose a threatened release of hazardous leaded dust outdoors prior to their repair and replacement; and because hazardous leaded dust can escape through open air conduits under, and through cracks in, bay doors and man doors, as well as other outlets.

519.    The past and future transfers of broken CRT glass from trucks into and out of the Property likewise posed and will pose a threatened release of hazardous leaded dust.

520.    The underlying purpose of the CRT conditional exclusion at 40 C.F.R. §261.39, which Defendant Closed Loop failed to maintain, is to "minimize releases to the environment of CRT glass (including fine solid materials)." *See also* 71 Fed. Reg. 42,928, 42,931 (July 28, 2006) ("broken CRTs and processed CRT glass are likely to pose a greater immediate risk of environmental releases" than intact CRTs.)

521.    As a result of the releases and/or threatened releases of hazardous substances, Olymbec has incurred and continues to incur response costs within the meaning of 42 U.S.C. §§9601(23) and (25).

522.    All of Olymbec's costs were and are being incurred consistent with CERCLA's NCP, 42 U.S.C. §9605(a) and 40 C.F.R. Part 300.

523.    To date, Olymbec has incurred in excess of $32,000.00 in such costs. Olymbec will continue to incur response costs in the future.

524.    These costs, including the costs described in Paragraph 523 and other paragraphs of this Complaint, are "necessary" costs of response as described in 42 U.S.C.

§9607(a)(4)(B), *inter alia*, because they were incurred: (i) to prevent trespassers from vandalizing the Properties; (ii) to prevent further deterioration of the CRTs and other e-waste, which releases additional lead; (iii) to seal or otherwise secure the Property, to the extent possible, to prevent lead dust from escaping outdoors; (iv) to characterize the contents, nature, and quantity of the hazardous substances so that they can be properly stored prior to removal, remedial action, recycling and/or disposal; (v) to identify potential options, locations, and cost estimates for recycling or disposing of the wastes so that they can be effectively removed and disposed of; and (vi) to prepare a health and safety procedures plan to avoid injuries to the workers who clean up the warehouses.

525.    Defendant Closed Loop had the authority to direct, manage and control, and did direct, manage and control, the acceptance, intake, handling, disposition, treatment, storage and disposal of the CRTs and other e-waste at the Property and other Closed Loop facilities in Ohio.

526.    CERCLA §107(a)(2), 42 U.S.C. §9607(a)(2) provides, in pertinent part, that any person who at the time of disposal of any hazardous substance operated a facility at which such hazardous substances were disposed of is liable to "any person" who, as a result of a release or threatened release of hazardous substances from the facility, incurs response costs consistent with the NCP. As such, Defendant Closed Loop is liable under CERCLA to Olymbec for all of Olymbec's response costs for the Property.

527.    Each of the other Defendants and their predecessors are persons, including entities and individuals, who: (a) are liable under CERCLA §107(a)(3), 42 U.S.C. §9607(a)(3), as persons who arranged with a third party for the disposal or treatment of CRTs and other e-waste owned or possessed by them at the Defendant Closed Loop's

facilities in Ohio, including the Property; or (b) are liable under CERCLA § 107(a)(4), 42 U.S.C. §9607(a)(4), as persons who accepted CRTs for transport to one or more of Defendant Closed Loop's facilities in Ohio, including the Property, selected by such persons. As such, the other Defendants and their predecessors are each liable under CERCLA for the environmental response costs for the Property.

528.    Olymbec is also entitled to statutory interest pursuant to 42 U.S.C. §9607(a)(4).

### THIRD CAUSE OF ACTION

### (Recovery of Preliminary Investigative Costs under CERCLA)

529.    Olymbec repeats and realleges the allegations in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

530.    The costs incurred by Olymbec as described in this Complaint include the costs of initial or preliminary investigation, site-assessment, evaluation of the impacts of releases and threatened releases, and monitoring costs for which Defendants are liable to Olymbec under 42 U.S.C. §9607(a), whether or not these costs are consistent with the NCP. Olymbec will continue to incur such costs.

### FOURTH CAUSE OF ACTION

### (Common Law Negligence and Negligence Per Se)

531.    For purposes of the Fourth Cause of Action, "Defendants" does not include Defendant UNICOR.

532.    Olymbec repeats and realleges the allegations in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

533. Each of the Defendants owed a duty to Olymbec, the owner of the Property, to use reasonable care to avoid causing reasonably foreseeable damage to the Property.

534. A reasonable and prudent person engaged in the transport of, or arranging for the transport of, CRTs and other e-waste exercises due diligence on downstream recipients to avoid causing injury to public health, property, or the environment.

535. Ohio Rev. Code Ann. § 3734.02(F) prohibits a person from storing, treating, or disposing of hazardous waste at any premises other than the types of facilities described in Paragraphs (1) through (5) of that section.

536. Ohio Rev. Code Ann. § 3734.02(F) prohibits a person from transporting hazardous waste or causing hazardous waste to be transported to any premises other than the types of facilities described in Paragraphs (1) through (5) of that section.

537. The Property is not among the types of facilities that are described in Paragraphs (1) through (5) of Ohio Rev. Code Ann. § 3734.02(F).

538. Under Ohio Rev. Code Ann. § 3734.02(F), the Defendants had a statutory duty to Olymbec to refrain from engaging in the activities prohibited by that statute on the Property.

539. Defendant Closed Loop violated its common law duty and statutory duty under Ohio Rev. Code Ann. § 3734.02(F) by storing, treating, and disposing of hazardous waste at the Properties and by causing hazardous waste to be transported to the Properties.

540. The Arranger/Transporter Defendants violated their common law duty and statutory duty under Ohio Rev. Code Ann. § 3734.02(F) by transporting hazardous waste to the Property, causing hazardous waste to be transported to the Property, and/or disposing of hazardous waste at the Property.

114

541. Ohio Rev. Code § 3734.02(F) was promulgated to prevent damage to persons such as Olymbec from the illegal disposal of hazardous wastes at locations not authorized to receive those wastes; the damage to Olymbec resulted from violations of that prohibition.

542. At all times relevant, Olymbec detrimentally relied on Defendant Closed Loop's representations that it would comply with all environmental laws, rules and regulations applicable to its operations at the Property.

543. At all times relevant, Olymbec detrimentally relied on the Arranger/Transporter Defendants' due diligence on Defendant Closed Loop as well as on the Arranger/Transporter Defendants' failure to perform their contractual obligations to Defendant Closed Loop in compliance with applicable federal and state hazardous waste law, which required a feasible means of recycling the CRTs and other e-waste disposed of at the Property.

544. The Arranger/Transporter Defendants created the condition that caused damage to Olymbec by transporting and/or arranging for the transport for CRTs and other e-waste to the Property, despite the fact that there was no feasible means of recycling them, whereas such acts and omissions advanced to a point so as to have launched a force or instrument of harm against Olymbec, as the owner of the Property.

545. By the acts and omissions of Defendants, Defendants were negligent and breached their duties to Olymbec, thereby proximately causing reasonably foreseeable damage to Olymbec, as the owner of the Property.

546. Because their acts and omissions violated Ohio Rev. Code Ann. § 3734.02(F), the Defendants were negligent per se.

547.     As a direct and proximate result of the acts and omissions of Defendants, Olymbec cannot rent or sell the Property in its present condition and has suffered and continues to suffer physical harm to the Property as well as economic harm, including, but not limited to, loss of rent, loss of business opportunity, and costs of environmental cleanup.

548.     The Defendants' sham recycling scheme was designed to shift the costs of disposing of the CRTs and other e-waste in the Property directly to Olymbec, the owner of the Property.

549.     The Defendants knew or should have known that their actions created strict liability under CERCLA and RCRA and their state corollaries for owners of properties at which there are releases or threated releases of hazardous substances or wastes, even when those properties are contaminated by third parties.

550.     Furthermore, Defendants acted with conscious disregard for the hazards associated with the hazardous substances they handled at the Property, and through their reckless acts and omissions caused the release or threatened release of hazardous substances and wastes at the Property for which Olymbec, the owner of the Property, may be held liable under federal and state hazardous waste law.

## FIFTH CAUSE OF ACTION

### (Private Nuisance)

551.     For purposes of this Fifth Cause of Action, "Defendants" does not include Defendant UNICOR.

552.      Olymbec repeats and realleges the allegations in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

116

553.    By reason of the Defendants actions and inactions, a private nuisance has been created at the Property.

554.    The actions and inactions of the Defendants constitute a wrongful invasion of Olymbec's use and enjoyment of the Property. Such nuisance continues to exist today and will exist unless and until the Defendants either take action to abate the nuisance or otherwise compensate Olymbec for the costs of abating the nuisance.

555.    The nuisance that exists at the Property constitutes an absolute nuisance. The intentional conduct and/or abnormally dangerous conditions that have been created by the Defendants cannot be maintained without injury to the Property, no matter what care is taken.

556.    The nuisance at the Property also constitutes a qualified nuisance. The Defendants caused and have maintained conditions at the Property that create an unreasonable risk of harm that has resulted or will ultimately result in injury to the Property.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Olymbec USA, LLC respectfully requests entry of judgment in its favor:

A.    With respect to the First Cause of Action, declaring that Olymbec is entitled to cost recovery for its removal and remedial actions to address CRT tubes, CRT glass, lead, leaded dust, lead-containing e-waste, and any other hazardous substances or wastes;

B.    With respect to the Second Cause of Action, awarding Olymbec damages in the amount of at least $4.2 million;

117

C.     With respect to the Third Cause of Action, awarding Olymbec its costs for initial or preliminary investigation, site-assessment, evaluation of the impacts of releases and threatened releases, and monitoring;

D.     With respect to the Fourth Cause of Action, awarding Olymbec damages (including environmental response costs, lost rent and other damages) in the amount of at least $5,100,000;

E.     With respect to the Fifth Cause of Action, ordering or otherwise requiring the Defendants to abate the nuisance that exists on the Property or awarding compensation to Olymbec for the costs of abating the nuisance.

F.     Award prejudgment interest to Olymbec pursuant to 42 U.S.C. §9607(a) on all sums it has expended;

G.     Award Olymbec its legal costs, expert witness fees, and attorney fees to the extent authorized by law; and

H.     Granting such other and further relief in law or equity as the Court may deem proper under the circumstances.

Dated: March 20, 2019.

Respectfully submitted,

*Trial Attorney*:

/s/ Daniel A. Brown
Daniel A. Brown, Esq. (Ohio Bar Reg. #0041132)
Brown Law Office LLC
204 S. Ludlow St. Suite 300
Dayton, Ohio 45402
(937) 224-1216 direct
(937) 224-1217 fax
dbrown@brownlawdayton.com

*Of Counsel*:

GLANKLER BROWN, PLLC

/s/ Randall B. Womack
Randall B. Womack
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 576-1747 direct
(901) 525-2389 fax
rwomack@glankler.com

(*Pro Hac Vice*)

ATTORNEYS FOR PLAINTIFF
OLYMBEC USA LLC